**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| COLUMBIA EXPORT TERMINAL, LLC, *Plaintiff-Appellant*, | No. 20-35037 |
| | D.C. No. 3:18-cv-02177-JR |
| v. | |
| INTERNATIONAL LONGSHORE AND WAREHOUSE UNION; KANE AHUNA, an individual; JASON ANDREWS, an individual; JESUS ARANGO, an individual; MIKE AYERS, an individual; BRIAN BANTA, an individual; KEN BANTA, an individual; KEITH BANTA, an individual; ANDRE BARBER, an individual; CRYSTAL BARNES, an individual; CRAIG BITZ, an individual; LISA BLANCHARD, an individual; RANDY BOOKER, an individual; BRAD BOYD, an individual; LARRY BROADIE, an individual; FELIX BROWN, an individual; JIMMY BROWN, an individual; JON BUDISELIC, an individual; WILLIAM BURRIS, an individual; DOUGLAS CAREY, an individual; GREG CARSE, an individual; ANTHONY CERRUTTI, an individual; HUGH COLSON, an individual; TIM COPP, an individual; | ORDER AND OPINION |

E. COTUREN, an individual; STEVEN COX, an individual; RYAN CRANSTON, an individual; JAMES DAW, an individual; ADAM DAY, an individual; JAMES DEGMAN, an individual; TORRAE DE LA CRUZ, an individual; FRANK DE LA ROSA, an individual; THOMAS DEMUTH, an individual; JAMES DINSMORE, an individual; BRIAN DIRCKSEN, an individual; TERENCE DODSON, an individual; GARY DOTSON, an individual; OLIVER EDE, an individual; RAY ELWOOD, an individual; TODD ENGLERT, an individual; CHRIS EUBANKS, an individual; DAVID FAMBRO, an individual; LARRY FAST, an individual; JAMES FINCH, an individual; GREG FLANNERY, an individual; MIKE GARDNER, an individual; BRETT GEBHARD, an individual; RICHARD GILSTRAP, an individual; TED GRAY, an individual; KURTIS HANSON, an individual; MIKE HARMS, an individual; RANDY HARPER, an individual; TERRY HICKMAN, an individual; JAMES HOLLAND, an individual; BRUCE HOLTE, an individual; RONALD HUSEMAN, an individual; NATHAN HYDER, an individual; TROY JAMES, an individual; SAM JAURON, an

individual; ANTHONY JEFFRIES, an individual; KEVIN JOHNSON, an individual; PAT JOHNSON, an individual; TERRY JOHNSON, an individual; TIM JONES, an individual; JON JULIAN, an individual; LEROY KADOW, an individual; GEORGE KELLY, an individual; ERIC KING, an individual; WAYNE KING, Esquire, an individual; KEVIN KNOTH, an individual; KENNETH KYTLE, an individual; MIKE LACHAPELLE, an individual; JIMMY LAI, an individual; TOM LANGMAN, an individual; TYLER LAUTENSCHLAGER, an individual; JACK LEE, an individual; KEN LEE, an individual; DAN LESSARD, an individual; SHANTI LEWALLEN, an individual; DANNY LOKE, an individual; THOMAS LOVE, an individual; WILFRED LUCH, an individual; KARL LUNDE, an individual; CRAIG MAGOON, an individual; MIKE MAHER, an individual; JASON MALACHI, an individual; LEVI MANNING, an individual; RICKIE MANNING, an individual; JAY MANTEI, an individual; PAT MARONAY, an individual; A. MARTIN, an individual; GARRY MATSON, an individual; PAT MCCLAIN, an individual; M. MCMAHON, an

individual; MIKE MCMURTREY, an
individual; DONALD MEHNER, an
individual; CURTIS MEULER, an
individual; KARL MINICH, an
individual; JOSH MORRIS, an
individual; JOHN MULCAHY, an
individual; TOM NEITLING, an
individual; MARTIN NELSON, an
individual; GREG NEMYRE, an
individual; RIAN NESTLEN, an
individual; CHRIS OVERBY, an
individual; KEN OVIATT, an
individual; THOMAS OWENS, an
individual; JOHN PEAK, an
individual; SHANE PEDERSON, an
individual; JEFF PERRY, an
individual; JOHN PERRY, an
individual; ARNOLD PETERSON, an
individual; TERRY PLAYER, an
individual; JAMES POPHAM, an
individual; DAVID PORTER, an
individual; MIKE RAPACZ, an
individual; JOHN RINTA, an
individual; WILLIAM ROBERTS, an
individual; JOSEPH ROBINSON, an
individual; MARK ROBINSON, an
individual; CHRIS SCHEFFEL, an
individual; THEODORE SCHUH, an
individual; MIKE SEXTON, an
individual; MARK SIEGEL, an
individual; COURTNEY SMITH, an
individual; JEFF SMITH, an
individual; MIKE SMITH, an

individual; SCOTT STEIN, an
individual; DONALD STYKEL, an
individual; MIKE SUHR, an
individual; LEAL SUNDET, an
individual; LAWRENCE THIBEDEAU,
an individual; MARK THORSFELDT,
an individual; SHAWN THORSTAD, an
individual; JAMES THORUD, an
individual; DAVID TRACHSEL, an
individual; WILLIAM UNDERWOOD,
an individual; JASON VANCE, an
individual; DAVID VARNON, an
individual; PAN VARNON, an
individual; MIKE WALKER, Esquire,
Attorney, an individual; DWAYNE
WAMSHER; EUGENE WEBB, an
individual; MIKE WEHAGE, an
individual; KEVIN WELDON, an
individual; SPENCER WHITE, an
individual; RICHARD WIDLE, an
individual; NURAL WILLIS, an
individual; RONALD WOODS, an
individual; MARK WRIGHT, an
individual; CAROL WURDINGER, an
individual; JERRY YLONEN, an
individual; P. YOCITIM, an
individual; RICHARD ZATTERBERG,
an individual; FRED ZOSKE, an
individual; JAMES COTHREN, an
individual; BOBBY CRANSTON, an
individual; TEREK JOHNSON, an
individual; ANGELA MARTIN,
Esquire, an individual; PATRICK

MCCLAIN, an individual; MATTHEW
MCMAHON, an individual; SHANN
PEDERSON, an individual; MICHAEL
SEXTON, an individual; JEFFREY
SMITH, an individual; LAURENCE
THUBEDEAU, an individual; PAUL
YOCHIM, an individual,
                    *Defendants-Appellees.*

Appeal from the United States District Court
for the District of Oregon
Michael H. Simon, District Judge, Presiding

Argued and Submitted October 26, 2020
Portland, Oregon

Filed January 5, 2022

Before:  Susan P. Graber, Richard R. Clifton, and
Sandra S. Ikuta, Circuit Judges.

Order;
Opinion by Judge Clifton;
Dissent by Judge Ikuta
Dissent from Order by Judge Bennett

# SUMMARY[*]

## RICO / Labor Law

The panel filed (1) an order withdrawing an opinion and dissent and denying, on behalf of the court, a petition for rehearing en banc; and (2) a new opinion and dissent. In the new opinion, the panel affirmed the district court's dismissal of an action brought by Columbia Export Terminal under the Racketeer Influenced and Corrupt Organizations Act against the International Longshore and Warehouse Union and individual union workers.

The panel concluded that Columbia Export Terminal's RICO claims alleging overbilling via fraudulent timesheets required interpretation of the collective bargaining agreement ("CBA") under which the workers were employed, and the CBA provided a process for arbitration of disputes. The panel concluded that the CBA's arbitration provision applied to the RICO claims. Accordingly, § 301 of the Labor Management Relations Act precluded adjudication of the RICO claims before the arbitration process was exhausted.

The panel agreed with the district court that *Hubbard v. United Airlines, Inc.*, 927 F.2d 1094 (9th Cir. 1991), remained good law, and the panel found persuasive *Hubbard*'s holding that the Railway Labor Act preempted a fraud claim under RICO. The panel held that a RICO claim is precluded by § 301 of the LMRA when the right or duty upon which the claim is based is created by a CBA or

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

resolution of the claim substantially depends on analysis of a
CBA.

Dissenting, Judge Ikuta wrote that the majority erred in
holding that any federal claim that is related to a CBA is
preempted or precluded by § 301 of LMRA and must
automatically be dismissed by the district court and sent for
arbitration.   The majority also erred in applying a
presumption of arbitrability and in determining that the
CBA's arbitration provision encompassed the RICO claims
at issue.

Dissenting from the denial of rehearing en banc, Judge
Bennett, joined by Judges Ikuta, R. Nelson, Bumatay, and
VanDyke, wrote that, whether called preemption or
preclusion, the LMRA does not bar a federal statutory claim
brought in federal court.  Judge Bennett wrote that a footnote
in *Alaska Airlines Inc. v. Schurke*, 898 F.3d 904, 920 n.10
(9th Cir. 2018) (en banc), erroneously suggested that § 301
"precludes" federal statutory claims in the same way it
preempts state law claims, and the court should have reheard
this case en banc to excise this erroneous preclusion notion
from its jurisprudence.  Judge Bennett wrote that preclusion
of federal claims is inconsistent with the purpose of § 301,
and a statute passed by Congress to help maintain a uniform
body of federal labor law does not somehow nullify a
different statute passed by Congress to, among other
objectives, eradicate organized attempts to defraud through a
pattern of racketeering activity.  Judge Bennett wrote that the
panel also erred in applying a presumption of arbitrability
contrary to Supreme Court precedent and created an
agreement to arbitrate RICO claims, even though the parties
never signed such an agreement.

**COUNSEL**

Christopher F. McCracken (argued) and Jacqueline M. Damm, Ogletree Deakins Nash Smoak & Stewart P.C., Portland, Oregon; Thomas A. Lidbury, Ogletree Deakins Nash Smoak & Stewart P.C., Chicago, Illinois; for Plaintiff-Appellant.

Darin M. Dalmat (argued) and Robert H. Lavitt, Barnard Iglitzin & Lavitt LLP, Seattle, Washington, for Defendants-Appellees.

## ORDER

The opinion and dissent filed on June 28, 2021 (Docket Entry No. 31), and published at 2 F.4th 1243 (9th Cir. 2021) are withdrawn. A new opinion and dissent are filed concurrently with this order.

Plaintiff-Appellant has filed a petition for rehearing en banc (Docket Entry No. 34). Judge Graber votes to deny the petition for rehearing en banc, and Judge Clifton so recommends. Judge Ikuta votes to grant the petition for rehearing en banc.

The full court has been advised of the petition for rehearing en banc. A judge of the court requested a vote on en banc rehearing. The matter failed to receive a majority of votes of non-recused active judges in favor of en banc consideration. Fed. R. App. P. 35.

The petition for rehearing en banc is **DENIED**. No further petitions for rehearing or rehearing en banc will be entertained.

## OPINION

CLIFTON, Circuit Judge:

Columbia Export Terminal ("CET") brought an action under the Racketeer Influenced and Corrupt Organizations Act ("RICO") against the International Longshore and Warehouse Union ("ILWU") and 154 individual ILWU workers employed by CET. The district court concluded that CET's RICO claims could not properly proceed in court at

this time and dismissed the case without prejudice. It reasoned that the claims required interpretation of the collective bargaining agreement ("CBA") under which the workers were employed, that the CBA provided a process for arbitration of disputes, and that the Labor Management Relations Act ("LMRA") precluded court adjudication of the RICO claims before the arbitration process had been exhausted. CET appeals the dismissal.

We previously reached a conclusion similar to that reached by the district court regarding a labor contract governed by the Railway Labor Act ("RLA"). *Hubbard v. United Airlines, Inc.*, 927 F.2d 1094 (9th Cir. 1991). The district court relied on that precedent, rejecting an argument by CET that *Hubbard* had been overruled. We agree with the district court that *Hubbard* remains alive and persuasive. Our conclusion that the same result is required for a contract governed by the LMRA is a logical extension of our precedents. We take that step here and affirm the judgment of the district court.

## I. Background

CET operates a grain export terminal in the Port of Portland and employs workers who are members of the ILWU. CET alleges that the ILWU and the 154 named individual defendants conspired to fraudulently furnish timesheets reporting hours that were not actually worked and, as a result, overbilled CET by more than $5.3 million.

CET filed this action alleging seven claims under RICO, 18 U.S.C. §§ 1961–68. In response, the ILWU filed a motion to dismiss contending, among other things, that CET's claims were preempted under § 301 of the LMRA, 29 U.S.C. § 185,

because resolution of the claims required interpretation of the underlying CBA, which requires exhaustion of the agreement's grievance procedures. The individual defendants joined the union's motion. The district court agreed with the ILWU and dismissed the case without prejudice. CET appeals.

## II. Discussion

The central dispute on appeal is whether CET's claims, which it styled as RICO claims, are preempted or precluded by § 301 of the LMRA. We review the district court's interpretation of the statutes *de novo*. *Alaska Airlines Inc. v. Schurke*, 898 F.3d 904, 916 (9th Cir. 2018) (en banc).

### A.   *The two-step preclusion and preemption under LMRA § 301.*

The LMRA, sometimes described as the Taft-Hartley Act, was enacted in 1947 to "promote the full flow of commerce" by "provid[ing] orderly and peaceful procedures for preventing [] interference by [employees or employers] with the legitimate rights of the other." 29 U.S.C. §141(b). To that end, LMRA § 301(a) provides that "[s]uits for violation of contracts between an employer and a labor organization . . . may be brought in any district court." 29 U.S.C. § 185(a).

On its face, § 301 reads as a jurisdictional statute, and it "contains no express language of preemption, [but] the Supreme Court has long interpreted the [provision] as authorizing federal courts to create a uniform body of federal common law to adjudicate disputes that arise out of labor contracts." *Curtis v. Irwin Indus., Inc.*, 913 F.3d 1146, 1151

(9th Cir. 2019); *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 450–51, 457 (1957).

Consistent with this purpose, the Supreme Court concluded that § 301 impliedly preempted state law in order to give effect to the congressional intent that "doctrines of federal labor law uniformly [] prevail over inconsistent local rules." *Teamsters v. Lucas Flour Co.*, 369 U.S. 95, 104 (1962). Therefore, any "union agreement made pursuant to [a federal labor law] has [] the imprimatur of the federal law upon it and, by force of the Supremacy Clause of Article VI of the Constitution, could not be [] vitiated by any provision of the laws of a State." *California v. Taylor*, 353 U.S. 553, 561 (1957) (quoting *Ry. Emp. Dept. v. Hanson*, 351 U.S. 225, 232 (1956)).

Federal courts have developed common law to govern labor disputes and have concluded that a "central tenet of federal labor-contract law under § 301 [is that] the arbitrator, not the court, [] has the responsibility to interpret the labor contract in the first instance." *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 220 (1985). As we explained in *Alaska Airlines* and reiterated last year in *Curtis*, preserving the role of the CBA's grievance process is important for three reasons:

> First, a [CBA] is more than just a contract; it is an effort to erect a system of industrial self-government. Thus, a CBA is part of the continuous collective bargaining process. Second, because the CBA is designed to govern the entire employment relationship, including disputes which the drafters may not have anticipated, it calls into being a new common law—the common law of a

> particular industry or of a particular plant.
> Accordingly, the labor arbitrator is usually the
> appropriate adjudicator for CBA disputes
> because he was chosen due to the parties'
> confidence in his knowledge of the common
> law of the shop and their trust in his personal
> judgment to bring to bear considerations
> which are not expressed in the contract as
> criteria for judgment. Third, grievance and
> arbitration procedures provide certain
> procedural benefits, including a more prompt
> and orderly settlement of CBA disputes than
> that offered by the ordinary judicial process.

*Curtis*, 913 F.3d at 1152 (internal quotation marks and citations omitted).

For more than sixty years, the Supreme Court has interpreted § 301 to require the specific performance of promises to arbitrate grievances in collective bargaining agreements. *Lincoln Mills*, 353 U.S. at 451.

We have thus applied the preemptive effect of § 301 to all "state law claims grounded in the provisions of a CBA or requiring interpretation of a CBA." *Kobold v. Good Samaritan Reg'l Med. Ctr.*, 832 F.3d 1024, 1032 (9th Cir. 2016). We have distilled the relevant Supreme Court cases into a two-part test:

> The essential inquiry is this: [1] Does the
> claim seek purely to vindicate a right or duty
> created by the CBA itself? If so, then the
> claim is preempted, and the analysis ends
> there.

[2] But if not, we proceed to the second step and ask whether a plaintiff's state law right is substantially dependent on analysis of the CBA, which turns on whether the claim cannot be resolved by simply looking to versus interpreting the CBA.

*Curtis*, 913 F.3d at 1152–53 (internal citations and quotation marks omitted).[1]

CET argues that this preemption approach properly applies only to claims arising under state law, not to claims, such as the RICO claims alleged here, arising under federal law. Instead, CET contends that we should apply a preclusion test that asks whether the two federal statutes necessarily conflict, and if so, favors the statute passed later in time. CET argues that because the RICO statute was enacted after the LMRA, if there is an irreconcilable conflict between the two federal statutes, the older one, the LMRA, must be deemed to have been repealed or amended by the later legislation.

We recognize, as CET argues, that a conflict between two federal laws implicates different considerations than a conflict between a state and a federal law. The Sixth Circuit considered this issue in the context of an Americans with Disabilities Act ("ADA") claim brought by a union employee. In permitting the ADA claim to proceed, the court explained that "Congress's power to preempt state law is rooted in the Supremacy Clause of the United States

---

[1] A variation of the test asks: (1) whether the claim asserted exists independently of the CBA, and if so (2) whether the resolution of the claim nonetheless substantially depends on analysis of the CBA. *Kobold*, 832 F.3d at 1032. Both versions of the test are used interchangeably.

Constitution." *Watts v. United Parcel Serv., Inc.*, 701 F.3d 188, 191 (6th Cir. 2012). "Because [the plaintiff's] claim is based on a federal cause of action and is in federal court, there is no danger of divergent application of a CBA's provisions by state courts; thus, the motivating purpose of § 301 preemption simply does not apply." *Id.* at 191–92.

We agree, but that is not the *only* purpose of § 301 preemption. Crucially, § 301 preemption also is designed to ensure "specific performance of promises to arbitrate grievances under collective bargaining agreements." *Lincoln Mills*, 353 U.S. at 451. As the Supreme Court explained in *Lueck*,

> If respondent had brought a contract claim under § 301, he would have had to attempt to take the claim through the arbitration procedure established in the collective-bargaining agreement before bringing suit in court. Perhaps the most harmful aspect of the Wisconsin decision [that permitted the state law tort claim to proceed] is that it would allow essentially the same suit to be brought directly in state court without first exhausting the grievance procedures established in the bargaining agreement. The need to preserve the effectiveness of arbitration was one of the central reasons that underlay the Court's holding in [*Lucas Flour*, 369 U.S. at 105.] The parties here have agreed that a neutral arbitrator will be responsible, in the first instance, for interpreting the meaning of their contract. Unless this suit is pre-empted, their

federal right to decide who is to resolve
contract disputes will be lost.

471 U.S. at 219.

This principle—that claims which are, in substance, labor
disputes subject to the CBA must not be evaded by artful
pleading—applies with equal force to federal statutory
claims,[2] "although they might be better described as
'precluded.'" *Alaska Airlines*, 898 F.3d at 920 n.10. The
LMRA guarantees a "federal right to decide who is to resolve
contract disputes." *Lueck*, 471 U.S. at 21. Therefore, when a
claim styled as a federal statutory claim turns in substance on
the provisions of the CBA rather than on an independent
statutory right, the federal court must direct the claim to the
proper adjudicator. *Cf. Vadino v. A. Valey Engineers*, 903
F.2d 253, 266 (3d Cir. 1990) ("In short, while claims resting
on [the Fair Labor Standards Act ("FLSA")] are clearly

---

[2] *Watts* seemed to recognize this principle as well. The Sixth
Circuit did not rest its holding solely on the inapplicability of preemption
doctrine as between two federal laws. The court further explained that "the
right to be free from disability discrimination that Watts seeks to vindicate
in this action *does not arise from the CBA* or from state law; rather, it is
founded on the ADA." *Watts*, 701 F.3d at 192 (emphasis added).
Moreover, the *Watts* court recognized that the outcome might have been
different had the employer "argued that [the employee] was *subject to a
mandatory arbitration agreement under the CBA* that she failed to exhaust
before bringing her ADA claim in federal court." *Id.* (emphasis added).

Thus, the *Watts* court acknowledged the distinction between federal
rights that arise independently from the CBA and rights that exist only
because of the CBA. This is precisely the distinction the preclusion
analysis aims to sift through, and the LMRA requires disputes arising
from the CBA to be funneled, if so required by the CBA, to arbitration.
Accordingly, our holding here is entirely consonant with *Watts*.

cognizable under that section, we believe that claims which rest on interpretations of the underlying collective bargaining agreement must be resolved pursuant to the procedures contemplated under the LMRA, specifically grievance, arbitration, and, when permissible, suit in federal court under section 301.").

Whether called "preemption" or "preclusion," the same two-step approach applies whether the conflicting statute is a federal or state provision. In *Hubbard*, for instance, we held that the RLA, which also preceded the enactment of RICO, preempted a fraud claim under RICO. 927 F.2d at 1099; *see also Long v. Flying Tiger Line, Inc.*, 994 F.2d 692 (9th Cir. 1993) (RLA precludes ERISA claims). Similar conclusions have been reached by circuit courts across the country.[3]

Although the Supreme Court has never directly passed on that precise question, we are guided by its holding that "[s]ection 301(a) governs claims founded directly on rights created by collective-bargaining agreements, *and also* claims

---

[3] Other circuits have applied the "preemption" or "preclusion" test when considering federal claims in the context of labor disputes, without referencing the dates of passage of each federal act. Like our court, the Seventh Circuit has also held that the RLA precludes RICO claims. *Underwood v. Venango River Corp.*, 995 F.2d 677 (7th Cir. 1993) *narrowed by Westbrook v. Sky Chefs, Inc.*, 35 F.3d 316, 317–18 (7th Cir. 1994) (RLA precludes RICO claims unless causes of action are independent of the CBA). Similarly, at least two circuits have held that the LMRA precludes FLSA claims. *Vadino*, 903 F.2d 253; *Martin v. Lake Cnty. Sewer Co., Inc.*, 269 F.3d 673 (6th Cir. 2001). At least four circuits have held that the RLA precludes ERISA claims. *de la Rosa Sanchez v. E. Airlines, Inc.*, 574 F.2d 29 (1st Cir. 1978)*; Ballew v. Cont'l Airlines, Inc.*, 668 F.3d 777 (5th Cir. 2012); *Hastings v. Wilson*, 516 F.3d 1055 (8th Cir. 2008); *Oakey v. U.S. Airways Pilots Disability Income Plan*, 723 F.3d 227 (D.C. Cir. 2013).

'substantially dependent on analysis of a collective-bargaining agreement.'" *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 394 (1987) (emphasis added) (quoting *Int'l Bhd. of Elec. Workers v. Hechler*, 481 U.S. 851, 859 n.3 (1987)). The Supreme Court has enforced arbitration requirements in § 301 cases when resolution of the claims required interpretation of the CBA, regardless of the form of the claim. *See, e.g.*, *Lueck*, 471 U.S. at 219 ("Since nearly any alleged willful breach of contract can be restated as a tort claim for breach of a good-faith obligation under a contract, the arbitrator's role in every case could be bypassed easily if § 301 is not understood to pre-empt such claims.")

Thus, in *Hubbard*, we explained that "federal labor law was intended to provide the exclusive remedy for generic fraud claims relating to rights under a CBA. If the same predicate acts were the basis of state claims for fraud . . . they would be preempted . . . [so plaintiffs] cannot evade preemption through 'artful pleading' of the claims as RICO claims." 927 F.2d at 1098. If the court held otherwise, any plaintiff could avoid arbitration by converting a garden-variety contract dispute into a case of federal racketeering.

Though in *Hubbard* we considered a labor contract under the RLA and reserved for another day the question of whether LMRA precludes RICO claims, that day has come. We hold that a RICO claim is precluded by § 301 of the LMRA when the right or duty upon which the claim is based is created by a CBA or resolution of the claim substantially depends on analysis of a CBA.

We have previously suggested this extension. Notably, two years ago our court, sitting en banc, observed that "the RLA and LMRA § 301 preemption standards are 'virtually

identical' in purpose and function, [and] they are, for the most part, analyzed under a single test and a single, cohesive body of case law." *Alaska Airlines*, 898 F.3d at 913 n.1 (quoting *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 260 (1994)). After discussing the development of the two-step test applying to claims under state law that require interpretation of a CBA, we explained that "[t]he same principle applies to federal law claims, although they might be better described as 'precluded.'" *Id*. at 920 n.10. The labor contract at issue in *Alaska Airlines,* like the contract involved in *Hubbard*, was governed by the RLA. The fact that the plaintiff had asserted a claim under a federal statute rather than a state law did not alter the outcome. The claim could not proceed, regardless of whether it was described as precluded or preempted.

### B. CET's RICO claims require analysis of the CBA.

Applying the two-step test, we conclude that CET's RICO claims are precluded by § 301 because resolution of the claims is substantially dependent on interpretation of the CBA. CET's RICO claims are premised on allegations that timesheets submitted by ILWU workers were inflated. To prove its case, CET must demonstrate that ILWU workers committed the predicate acts of mail and wire fraud by knowingly overbilling CET for time not worked. However, ILWU contends that the billed hours were expressly authorized by CET and charged in accordance with the CBA.

There are a host of CBA provisions that could excuse the workers from being present at the time of work reported on the timesheets or could explain why workers are compensated for time not actually worked. For instance, ¶ 4-1 guarantees a minimum of 8 hours of pay for employees who arrive at work and are put to work even if released before the 8-hour

shift concludes. Paragraph 4-5 guarantees a minimum 4 hours of pay for those sent home upon arrival. Further, Section XII of the CBA details special rules for "steady" employees: ¶ 12-3 guarantees 40 hours' work per week, and ¶ 12-4 sets maximum durations for lay-off periods. Finally, ¶ 8-1 of the CBA lists paid holidays, ¶ 9-1 alludes to paid vacation time, and ¶ 6-4 provides for paid meal periods with minimum durations.

Resolution of the RICO claims will also require interpretation of the CBA to determine how it applies, if it does, to an issue which its express terms do not appear to discuss: whether employees can claim all of their compensable hours in their weekly timesheets, or whether they must simply list time actually worked and await a forensic recalculation of their pay.

These issues are not, as the dissent suggests, at 38–39, merely "speculative" or "hypothetical." Rather, they are intrinsic to CET's claims as pleaded and argued to the district court and to us. Permitting the district court to proceed before the grievance process has been exhausted would "eviscerate a central tenet of federal labor-contract law under § 301 that it is the arbitrator, not the court, who has the responsibility to interpret the labor contract in the first instance." *Lueck*, 471 U.S. at 220.

Notably, CET has not argued that its claims are unrelated to the CBA. That is not surprising, for the subject of its claim, the number of hours for which its employees are entitled to claim payment, is at the core of an employment relationship and is something a CBA could be expected to govern. Instead, CET contends that the CBA is unambiguous. That is

an argument that CET can make within the grievance process. The claims cannot be resolved by mere reference to the CBA.

We thus conclude that CET's RICO claims substantially depend on interpretation of the CBA. The LMRA thus precludes them and requires that federal courts ensure "specific performance of promises to arbitrate grievances under collective bargaining agreements." *Lincoln Mills*, 353 U.S. at 451. Accordingly, we turn next to what, exactly, the CBA promises.

### C. *The CBA's arbitration provision applies to RICO claims.*

CET argues that even if § 301 could preclude its RICO claims, it should have no preclusive effect in this instance because the CBA's arbitration provision does not contemplate RICO claims and does not bind CET with regard to the ILWU or the individually-named defendants. CET argues that the CBA's arbitration provision should be interpreted to exclude any statutory claims or any disputes between the employer and the ILWU umbrella organization, or between the employer and the 154 individually-named defendants. These arguments fail for several reasons.

CET's preferred reading of the arbitration provision directly contradicts the plain text of the CBA. By its own terms, the CBA's arbitration provision applies to "any controversy or disagreement or dispute . . . as to the interpretation, application, or violation" of "any" of its provisions. ¶ 16-2. It then sets forth a process for the resolution of "all grievances." ¶ 16-4. The text of the CBA does not say, as it could, that RICO—or any other statutory claim—is excluded from the grievance process, even if it

involves "the interpretation, application, or violation" of the CBA.

Rather, the CBA explicitly contemplates a dispute resolution mechanism covering the exact conduct alleged as the basis of CET's current claims. For example, Section XIV lays out the standard of work expected of individual employees (*e.g.*, "not leaving their work station in advance of the designated quitting time") and goes on to state that "[a]ny Employer may file with the union a complaint in writing against any member of the grain section of the Union" and allows the aggrieved employer to proceed before the Joint Labor Relations Committee if it does not receive a satisfactory response.

Further, the ILWU is a signatory to the agreement and is capable of enforcing the agreement on its own behalf, and the employees, through their bargaining representatives, are also treated as parties to the agreement.

At most, CET's preferred interpretation could create some doubt as to the scope of the CBA's grievance procedures. Even so, "[t]he party contesting arbitrability bears the burden of demonstrating how the language in the collective bargaining agreement excludes a particular dispute from arbitration." *Standard Concrete Prods., Inc. v. Gen. Truck Drivers, Office, Food & Warehouse Union, Local 952*, 353 F.3d 668, 674 (9th Cir. 2003) (quoting *Phx. Newspaper, Inc. v. Phx. Mailers Union Local 752*, 989 F.2d 1077, 1080 (9th Cir. 1993)). Any "[d]oubts should be resolved in favor of coverage." *Id.* at 674 (citations omitted). CET, as the party refuting the plain reading of the CBA's scope, has not met its burden of persuasion.

The dissent reaches a different conclusion in large because it disregards the presumption in favor of arbitration under federal law. It contends, at 39, that the parties must "expressly consent" to arbitrate RICO claims, citing *Granite Rock Co. v. Int'l Brotherhood of Teamsters*, 561 U.S. 287, 298 n.6, 297 (2010). But it does not consider or account for what else *Granite Rock* says.

Like this case, *Granite Rock* was a dispute between an employer and a union. The CBA governing the relationship between the parties expired in April 2004. *Id*. at 292. When negotiations for a new CBA reached an impasse, the union workers initiated a strike in June 2004. *Id*. Granite Rock and the union ultimately reached an agreement on a new CBA on July 2. *Id.* at 292–93. However, the new CBA did not include a provision to hold the union and its members harmless for any strike-related damages that the employer may have incurred in the interim. *Id.* at 293. In an effort to secure the waiver of liability, the local union, under the instruction of its parent, the International Brotherhood of Teamsters ("IBT"), resumed the strike even though the new CBA contained a no-strike provision. *Id.* Granite Rock brought a § 301 action in federal court seeking an injunction against the ongoing strike, and seeking damages against both the local union and IBT. *Id.* at 294. The strike ultimately ended in September, but Granite Rock continued to seek damages. *Id.* at 294–95.

During the litigation, a factual dispute arose as to the date that the new CBA became effective, with Granite Rock claiming that the agreement was ratified by union members on July 2, and the union claiming that it was ratified later, on August 22. *Id.* at 295. The district court held that the issue was for a court to decide, and submitted the question to a jury, which reached a unanimous verdict that the local had

ratified the CBA on July 2. *Id.* at 295. The Ninth Circuit reversed, reasoning that the parties' dispute was governed by the CBA's arbitration clause, which covered strike-related claims. *Id.*

The Supreme Court granted certiorari, and reversed, viewing the case as an opportunity to "reemphasize the proper framework for deciding when disputes are arbitrable." *Id.* at 297. The Court began with the proposition that "[i]t is well settled in both commercial and labor cases that whether parties have agreed to submit a particular dispute to arbitration is typically an issue for judicial determination." *Id.* at 296 (internal quotation marks and brackets omitted). More specifically, "where the dispute at issue concerns contract formation, the dispute is generally for courts to decide." *Id.* But where, as here, the formation and validity of the contract is not at issue, and the parties "have agreed to arbitrate some matters pursuant to an arbitration clause, the law's permissive policies in respect to arbitration counsel that any doubts concerning the scope of arbitral issues should be resolved in favor of arbitration." *Id.* at 298 (internal quotation marks and emphasis omitted).  In such cases, reviewing courts must proceed by:

> (1) applying the presumption of arbitrability only where a validly formed and enforceable arbitration agreement is ambiguous about whether it covers the dispute at hand; and (2) adhering to the presumption and ordering arbitration only where the presumption is not rebutted.

*Id.* at 301 (internal quotation marks omitted).

The parties in our case do not dispute that there is a valid CBA and that the CBA includes a grievance provision under which they have agreed to arbitrate some matters. The dissent does not contend otherwise. Rather, there is only a dispute as to whether the agreement's scope covers CET's RICO claims. *Granite Rock* directs us, therefore, to resolve any doubts concerning the scope of issues to be referred to arbitration in favor of arbitration. That is the process that the district court followed to reach the conclusion that we affirm.

We do not hold, as the dissent suggests, at 45, that RICO claims are preempted by the LMRA and subject to arbitration in every instance, simply by virtue of being an "employment-related dispute." Like state-law fraud claims, RICO claims are not preempted or precluded by § 301 unless they are (1) based on a right or duty created by the CBA, or (2) require interpretation of the CBA. *See, e.g.*, *Operating Eng'rs Pension Tr. v. Wilson*, 915 F.2d 535, 537–39 (9th Cir. 1990) (holding that § 301 does not preempt state tort claim for fraud in the inducement of a CBA).[4] Even then, reviewing courts must still look to the scope of the CBA's arbitration provision to determine if those claims are arbitrable under the framework established in *Granite Rock*.

The dissent's argument that there is no presumption in favor of arbitration, such that it must be established that the parties agreed to each specific type of claim, is simply inconsistent with *Granite Rock*, the authority it purports to rely on, and decades of caselaw. *See, e.g., United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*,

---

[4] Similarly, we have already held that federal labor law does not preclude criminal RICO action. *See, e.g.*, *United States v. Thordarson*, 646 F.2d 1323, 1331 (9th Cir. 1981).

363 U.S. 574, 582–83 (1960) ("[Under § 301, an] order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.")[5]

Finally, we note that CET is not permanently barred from pursuing its claims. The dismissal by the district court was without prejudice and properly so. CET is simply required to exhaust the grievance process to which it agreed in the CBA before it can proceed in federal court with those claims.

### D.  The Buell exception does not apply.

We address one final point. CET argues that another precedent, *Atchison, Topeka & Santa Fe Ry. Co. v. Buell*, 480 U.S. 557 (1987), should control. We disagree.

In *Buell*, the Supreme Court held that an employee's claims under an independent federal statute, the Federal Employers Liability Act, were not precluded by the RLA. *Id.* at 565–67. In that decision, however, the Supreme Court reiterated the general rule in favor of compelling arbitration in labor disputes, while recognizing an exception for claims based on federal statutes that contain specific substantive guarantees for workers. *Id.* at 565 ("[N]otwithstanding the

---

[5] *See also Gateway Coal Co. v. United Mine Workers*, 414 U.S. 368, 377–78 (1974); *Nolde Bros. v. Bakery & Confectionery Workers Union*, 430 U.S. 243, 254–55 (1977); *AT&T Techs. v. Communs. Workers of Am.*, 475 U.S. 643, 650 (1986); *Inlandboatmens Union of the Pac. v. Dutra Grp.*, 279 F.3d 1075, 1078 (9th Cir. 2002); *SEIU v. St. Vincent Med. Ctr.*, 344 F.3d 977, 985 (9th Cir. 2003); *Int'l All. of Theatrical Stage Emple. v. Insync Show Prods., Inc.*, 801 F.3d 1033, 1042 (9th Cir. 2015).

strong policies encouraging arbitration, 'different considerations apply where the employee's claim is based on rights arising out of a statute designed to provide minimum substantive guarantees to individual workers.'" (quoting *Barrentine v. Arkansas-Best Freight System, Inc.*, 450 U.S. 728, 737 (1981))); *see also id.* (citing *McDonald v. West Branch*, 466 U.S. 284 (1984) (CBA arbitration decision does not preclude § 1983 claims); *Barrentine*, 450 U.S. 728 (CBA arbitration decision does not preclude FLSA claims); *Alexander v. Gardner-Denver Co.*, 415 U.S. 36 (1974) (CBA arbitration decision does not preclude Title VII claims)).

This reading of *Buell* is consistent with decisions that have stressed that "§ 301 cannot be read broadly to pre-empt nonnegotiable rights conferred on individual employees [even under] state law." *Livadas v. Bradshaw*, 512 U.S. 107, 123 (1994). "Setting minimum wages, regulating work hours and pay periods, requiring paid and unpaid leave, protecting worker safety, prohibiting discrimination in employment, and establishing other worker rights remains well within the traditional police power of the states." *Alaska Airlines*, 898 F.3d at 919. Therefore, "claims alleging violations of such protections will not necessarily be preempted, even when the plaintiff is covered by a CBA." *Curtis*, 913 F.3d at 1152.

We have consistently observed this exception. *See, e.g.*, *Felt v. Atchison, Topeka & Santa Fe Ry. Co.*, 60 F.3d 1416 (9th Cir. 1995) (RLA does not preclude Title VII claims); *Saridakis v. United Airlines*, 166 F.3d 1272 (9th Cir. 1999) (RLA does not preclude ADA claims).

The exception does not apply here, however. The current claims have been brought by an employer, and the federal

statute at issue, RICO, does not establish substantive guarantees for workers.

## III.    Conclusion

We affirm the dismissal of this action without prejudice by the district court. CET's RICO claims are subject to the CBA's arbitration provision, and are precluded by LMRA § 301.

**AFFIRMED.**

---

IKUTA, Circuit Judge, dissenting:

The majority today makes two serious errors that will throw our Labor Management Relations Act (LMRA) jurisprudence into disarray. First, it holds that any federal claim that is related to a collective-bargaining agreement (CBA) is preempted or precluded by § 301 of LMRA and must automatically be dismissed by the district court and sent for arbitration. Majority at 22. This ruling mistakenly applies our jurisprudence developed for Railway Labor Act (RLA) claims to LMRA claims. Second, the majority contradicts itself by holding that even if a federal claim is "precluded," a court "must still look to the scope of the CBA's arbitration provision to determine if those claims are arbitrable." Majority at 26. Here, the majority errs by applying a presumption of arbitrability, even though the Supreme Court has made clear that such a presumption does not apply where the arbitration provision is unambiguous. *Granite Rock Co. v. Int'l Brotherhood of Teamsters*, 561 U.S. 287, 301 (2010). In light of these and other errors, I dissent.

I

The primary purpose of § 301 of LMRA is to ensure that federal courts can apply federal common law to CBA disputes even when a claim is pleaded as a state-law claim. On its face, § 301 gives federal courts jurisdiction over "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce." 29 U.S.C. § 185(a).[1] The Supreme Court has interpreted this section as directing federal courts to create and apply a federal common law for interpreting CBAs, *see Textile Workers Union v. Lincoln Mills of Ala.*, 353 U.S. 448, 456 (1957), so as to ensure that uniform federal labor law prevails over inconsistent interpretations of CBAs by state courts, *see Loc. 174, Teamsters, Chauffeurs, Warehousemen & Helpers v. Lucas Flour Co.*, 369 U.S. 95, 104–05 (1962). We refer to state claims covered by § 301 of LMRA as "preempted" and federal claims covered by § 301 of LMRA as "precluded." *Alaska Airlines, Inc. v. Schurke*, 898 F.3d 904, 920 n.10 (9th Cir. 2018) (en banc). These terms do not mean "typical conflict preemption" or preclusion, *id.* at 922, but merely refer to claims that, pursuant to § 301 of LMRA, must be decided in federal court under federal labor law.

---

[1] Section 301 of LMRA, 29 U.S.C. § 185(a), states in full:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

If a plaintiff brings a state-law claim in state court, courts apply a two-part inquiry, asking whether (1) the claim alleges a breach of a CBA or (2) requires the interpretation of the CBA. *See, e.g.*, *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 405–07 (1988); *Schurke*, 898 F.3d at 920. If the court finds that § 301 of LMRA applies under this two-part test, then the defendants may remove the case to federal court through the jurisdictional doctrine of "complete preemption," which is "an exception to the well-pleaded complaint rule." *Schurke*, 898 F.3d at 923 n.15. Once the federal court determines that removal under § 301 of LMRA was proper, the jurisdictional inquiry for preemption is over. By contrast, when a federal claim is brought in federal court in the first instance, no jurisdictional inquiry under § 301 of LMRA is necessary. Therefore, in this context, § 301 has little work to do.[2]

Once a claim (state or federal) is properly in federal court, the court's inquiry under LMRA is, at its core, a question of contract interpretation. *See id.* at 918 n.7.[3] If the claim

---

[2] Indeed, given the limited nature of LMRA's impact in this context, a sister circuit has concluded that "the motivating purpose of § 301 preemption simply does not apply" to federal claims. *Watts v. United Parcel Serv., Inc.*, 701 F.3d 188, 190–93 (6th Cir. 2012). We have not directly ruled on this point. *Cf. Schurke*, 898 F.3d at 920 & n.10.

[3] Although the majority claims that other circuits apply a "preemption" or "preclusion" test to consider federal claims in the context of labor disputes, Majority at 18 n.3, the LMRA cases cited by the majority merely determined that an employee's Fair Labor Standards Act claims required an interpretation of the CBA, and therefore were subject to LMRA's statute of limitations. *See Vadino v. A. Valey Eng'rs*, 903 F.2d 253, 266 (3d Cir. 1990); *Martin v. Lake Cnty. Sewer Co.*, 269 F.3d 673, 679 (6th Cir. 2001). These cases do not affect the conclusion that, after federal jurisdiction exists, we are tasked only with deciding a

alleges a breach of the CBA or requires interpretation of the CBA, then the federal court need only read, apply, and enforce the CBA, including any applicable arbitration provision. There is no "presumption that labor disputes are arbitrable whenever they are not expressly excluded from an arbitration clause." *Granite Rock*, 561 U.S. at 301 n.8. If the CBA or labor contract does not require that the dispute be resolved by arbitration, then the court must resolve the dispute itself by applying the terms of the CBA pursuant to federal common labor law. *See, e.g.*, *Painting & Decorating Contractors Ass'n v. Painters & Decorators Joint Comm.*, 707 F.2d 1067, 1070–72 (9th Cir. 1983).

This contractual focus differentiates LMRA from the RLA, 45 U.S.C. §§ 151–65, which covers the railroad and airline industries. The standard for determining when a state-law claim is preempted by the RLA is "virtually identical to the pre-emption standard the Court employs in cases involving § 301 of the LMRA." *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 260 (1994). But if the RLA's dispute-resolution provisions apply to a claim, then the statute itself "requires submission of such disputes to internal dispute-resolution processes and then to a division of the National Adjustment Board or an arbitration board selected by the parties." *Moore-Thomas v. Alaska Airlines, Inc.*, 553 F.3d 1241, 1245 (9th Cir. 2009). Because the text of the RLA mandates arbitration of any covered claim, it provides no guidance in determining whether a claim precluded by LMRA must be arbitrated. *Cf. Hubbard v. United Airlines,*

---

question of contract interpretation to determine whether the federal claims must be arbitrated. *See Granite Rock*, 561 U.S. at 310–11.

*Inc.*, 927 F.2d 1094, 1097–98 (9th Cir. 1991), *abrogated in part*, *Norris*, 512 U.S. at 263 n.9.[4]

Here, Columbia Export Terminal (CET) brought federal claims in federal court, so no jurisdictional inquiry is required to ensure the propriety of removing the case from state court. And because § 301 of LMRA applies, rather than the RLA, this case presents only a question of contract interpretation, *see Granite Rock*, 561 U.S. at 311, and we must determine whether CET's claims as pleaded are subject to the CBA's grievance and arbitration procedures. In short, the only question at issue here is whether CET's complaint raises claims that the parties intended to be decided in the arbitral forum established by the CBA among the parties.[5] Accordingly, to the extent the majority holds that if a federal claim is "grounded in the provisions of a CBA or requiring interpretation of a CBA," Majority at 14, then the claim is

---

[4] Thus, the majority's reliance on RLA cases that required federal RICO claims to go to RLA-mandated adjustment boards, Majority at 18 & n.3, is inapposite, as these cases do not provide guidance on the question whether LMRA can "preclude" CET's RICO claims. *Cf. Underwood v. Venango River Corp.*, 995 F.2d 677, 685 (7th Cir. 1993), *overruled in part*, *Westbrook v. Sky Chefs, Inc.*, 35 F.3d 316, 317–18 (7th Cir. 1994). And the majority's reliance on ERISA cases involving RLA-mandated arbitration proves even less persuasive, because ERISA itself disclaims any effect on or conflict with earlier enacted federal laws. *See* 29 U.S.C. § 1144(d).

[5] The majority implicitly acknowledges that the only question here is whether the parties agreed to arbitrate the types of claims raised in CET's complaint. Thus, the majority explains that the "LMRA requires disputes arising from the CBA to be funneled, *if so required by the CBA*, to arbitration," Majority at 17 n.2, and the majority's "preclusion" analysis is merely intended to "direct the [federal statutory claim] to the proper adjudicator," Majority at 17.

precluded by § 301 of LMRA and must be dismissed by the
district court for arbitration, Majority at 22, it is wrong.

## II

After consuming multiple pages with its theory that RICO
claims are "precluded by § 301" and subject to the two-part
test for preemption, Majority at 12–22, the majority suddenly
shifts gear and indicates that this conclusion is irrelevant,
because, even after the two-step preemption test, "reviewing
courts must still look to the scope of the CBA's arbitration
provision to determine if those claims are arbitrable under the
framework established in *Granite Rock*." Majority at 26.
Although this conclusion is correct (and makes the majority's
lengthy preclusion analysis mere dicta), the majority errs by
misunderstanding *Granite Rock*'s analysis of how courts must
determine whether an arbitration provision in a CBA covers
the claim at issue.

## A

In *Granite Rock*, the Ninth Circuit made the same mistake
the majority makes here: it applied the presumption that "any
doubts concerning the scope of arbitral issues should be
resolved in favor of arbitration," and erroneously held that a
LMRA dispute was governed by a CBA's arbitration clause.
561 U.S. at 298. The Supreme Court reversed. As *Granite
Rock* explained, the Supreme Court has never "held that
courts may use policy considerations as a substitute for party
agreement," *id.* at 303, or "held that this policy overrides the
principle that a court may submit to arbitration 'only those
disputes . . . that the parties have agreed to submit,'" *id.*
at 302 (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S.
938, 943 (1995)). Rather, a court must apply "the proper

framework for deciding when disputes are arbitrable." *Id.* at 297.

Under the *Granite Rock* framework, a court must first use ordinary principles of contract interpretation to determine if the arbitration provision is "best construed to encompass the dispute." *Id.* at 303. "[A] court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate *that dispute*." *Id.* at 297. This means that a court must first "resolve any issue that calls into question the formation or applicability of the specific arbitration clause that a party seeks to have the court enforce." *Id.*

Then, only "where a validly formed and enforceable arbitration agreement is ambiguous about whether it covers the dispute at hand," may a court apply "the presumption of arbitrability" and ask whether the arbitration provision is reasonably construed as covering the asserted dispute. *Id.* at 301. Even if the court concludes the arbitration provision is susceptible to such an interpretation, and therefore the presumption of arbitrability applies, a court may order arbitration "only where the presumption is not rebutted." *Id.*

## B

Applying this framework here, we begin by construing the text of the CBA, using ordinary principles of contract interpretation, to determine which claims must be decided by the CBA's grievance and arbitration procedures. Section XVI of the CBA provides "procedures for handling grievances and disputes." The CBA defines a grievance as follows:

> A grievance shall be defined as any controversy or disagreement or dispute between the applicable ILWU Local Union and the Employer for the particular grain elevator(s) involved as to the interpretation, application, or violation of any provision of this Agreement.

The CBA provides that all grievances between the local unions and CET must be resolved pursuant to the procedures in Section XVI of the CBA. Under Section XVI, the parties must attempt to resolve the grievance informally. If it is not resolved, it must be referred to a "Joint Labor Relations Committee" comprised of representatives from "the applicable ILWU Local Union" and "the applicable Employer." The committee has "the power and duty to investigate and adjudicate all grievances or disagreements or disputes arising under this Agreement." If the committee is unable to resolve the dispute, then the committee defines "the question or questions in dispute," and either party may refer the question "to an impartial arbitrator." The CBA then outlines the procedure for conducting arbitration. Finally, CET "shall also have the right to file a grievance and to follow the above grievance procedure in an effort to resolve it."

## C

After reviewing the relevant provisions of the CBA regarding which claims are subject to its grievance and arbitration procedures, we next consider the nature of CET's claims, beginning with an accurate description of CET's claims "as pleaded." *See Schurke*, 898 F.3d at 924 (holding that, in determining whether a state law claim requires the

interpretation of a CBA, a federal court must consider the claim "as pleaded"). According to the operative complaint, CET employs union-represented workers to load grain for international shipping at a terminal in Portland, Oregon (Terminal 5). CET sued the International Longshore and Warehouse Union (ILWU) and approximately 160 individual hourly workers who are members of two local labor organizations chartered by ILWU. According to the complaint, the defendants, "with specific intent to defraud, jointly entered into a conspiracy and scheme" to "routinely and systematically, over a period of more than four years," under-staff jobs and submit time sheets "indicating time worked for employees who did not work, and were not even at Terminal 5, for some or all of the indicated time." The complaint alleged that workers "billed hours and received unearned payment" for time claimed on their time sheets when they were not present at Terminal 5. Among other practices, workers split shifts "with one working the first half and the other working the second half, yet submitting time sheets indicating falsely that both had worked the full shift." Another practice involved workers who were present at the terminal submitting time sheets showing that an absent worker, who had not showed up, "worked a full shift." The complaint alleged that through these fraudulent practices, workers illegally obtained over $5 million from CET.

Based on these factual allegations, the complaint brought seven RICO claims.[6] The complaint alleged that each

---

[6] These claims include allegations that the defendants invested income derived from a pattern of racketeering activity in violation of 18 U.S.C. § 1962(a), that ILWU acquired an indirect interest in and indirect control of CET through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(b), that the defendants participated in the conduct of the local

submission of a fraudulent time sheet constituted a predicate act of mail or wire fraud under 18 U.S.C. § 1341 and § 1343, and that the defendants engaged in a pattern of racketeering activity.

## D

The key question is whether CET's claims, as pleaded, must be arbitrated under the CBA. To make this determination, we apply principles of contract interpretation, as informed by the common law of federal labor law and labor arbitration precedents. *See Standard Concrete Prods., Inc. v. Gen. Truck Drivers, Office, Food & Warehouse Union, Loc. 952*, 353 F.3d 668, 673–75 (9th Cir. 2003); *see also M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 435 (2015); *Granite Rock*, 561 U.S. at 298 n.6.

Federal common law provides important guidance for interpreting the key terms in the CBA. Under federal common law, we construe the word "interpretation" narrowly as meaning "something more than 'consider,' 'refer to,' or 'apply.'" *Schurke*, 898 F.3d at 921 (quoting *Balcorta v. Twentieth Century-Fox Film Corp.*, 208 F.3d 1002, 1108 (9th Cir. 2000)). Because a plaintiff's claim, "as pleaded," drives the analysis, there must be an "active dispute" as to the interpretation of a CBA provision and not simply a "'*hypothetical* connection between the claim and the terms of the CBA.'" *Schurke*, 898 F.3d at 921 (quoting *Cramer v. Consol. Freightways, Inc.*, 255 F.3d 683, 691 (9th Cir. 2001) (en banc)). A court must wait until an active dispute arises;

---

unions through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), and that the defendants conspired to violate the prior three sections in violation of 18 U.S.C. § 1962(d).

it cannot rely on the "speculative possibility" of an interpretive dispute or the "possibility that things could change down the road." *McCray v. Marriott Hotel Servs., Inc.*, 902 F.3d 1005, 1013 (9th Cir. 2018). Nor does an interpretive dispute exist merely because a defendant relies on CBA provisions as a defense to a plaintiff's claim. *See, e.g.*, *Ward v. Circus Circus Casinos, Inc.*, 473 F.3d 994, 997–99 (9th Cir. 2007); *Detabali v. St. Luke's Hosp.*, 482 F.3d 1199, 1203–04 (9th Cir. 2007); *Matson v. United Parcel Serv., Inc.*, 840 F.3d 1126, 1134–35 (9th Cir. 2016).

Using ordinary principles of contract interpretation, it is immediately apparent that the arbitration provision in the CBA does not cover CET's claims against ILWU. The CBA's interpretation of "grievance" is limited to controversies, disagreements, or disputes "between the applicable ILWU Local Union and the Employer for the particular grain elevator(s)." Therefore, it is unambiguous that CET's claims against ILWU falls outside the definition of a grievance. *See, e.g.*, *Standard Concrete*, 353 F.3d at 674–75. Accordingly, CET has no obligation to arbitrate its claims against ILWU. The majority errs in holding otherwise. Majority at 22–27.

Second, it is immediately apparent that the parties did not agree to arbitrate federal statutory claims in general, or RICO claims in particular. The parties to the CBA could have agreed to do so, because courts will enforce agreements to arbitrate federal statutory claims, *see 14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 263–64 (2009). But, for such an agreement to be enforceable, the parties must expressly consent to such a provision, *see id.*; *Granite Rock*, 561 U.S. at 300, and any CBA requirement to arbitrate such claims "must be particularly clear," *Wright v. Universal Mar. Serv.*

*Corp.*, 525 U.S. 70, 79–80 (1998).  The CBA's grievance and arbitration provisions here do not expressly agree to arbitrate RICO claims, or any other statutory claims, or authorize the arbitrators to resolve such claims.

Therefore, unless the CBA's arbitration provision is ambiguous, it would apply to CET's claims only if the CBA's definition of "grievance" is best construed as covering the claims.  The word "grievance" is defined in the CBA as "any controversy or disagreement or dispute" involving "the interpretation, application, or violation of any provision of this Agreement."  Under federal labor law, a dispute over "the interpretation or application" of a CBA refers to "a claim arising out of a CBA."  *Norris*, 512 U.S. at 254.  Because CET does not allege a violation of the CBA, and there is no dispute over how a CBA provision applies to CET's claims, the key question is whether litigating CET's RICO claim "requires interpretation of a CBA."  *Schurke*, 898 F.3d at 921.  As noted above, under federal common labor law, "'interpretation' is construed narrowly," and covers claims only "to the extent there is an active dispute over 'the meaning of contract terms.'"  *Id.* (quoting *Livadas v. Bradshaw*, 512 U.S. 107, 124 (1994)).

Based on a straightforward application of ordinary contract interpretation principles, resolving CET's RICO claims does not require interpretation of the CBA.  The complaint simply alleges that the individual workers submitted fraudulent time sheets claiming hours worked at Terminal 5 during periods in which they were not  physically present at the terminal.  Proving the elements of mail and wire fraud here requires only a factual inquiry into whether employees claimed they were working when they were not physically on site.  "The need for a 'purely factual inquiry

that does not turn on the meaning of any provision of a collective-bargaining agreement,' however, is not cause for preemption under section 301," *Burnside v. Kiewit Pac. Corp.*, 491 F.3d 1053, 1072 (9th Cir. 2007) (quoting *Lingle*, 486 U.S. at 407) (cleaned up), meaning that a purely factual inquiry does not require an interpretation of a CBA under our two-part test.

The defendants' arguments to the contrary fail. Because it is not possible to explain how CET's claims, "as pleaded," require construing the CBA, *Schurke*, 898 F.3d at 924, the defendants take the easier route of recharacterizing the complaint. While CET's complaint alleges that defendants conspired to defraud CET by making false claims about their presence for work at Terminal 5, the defendants reinvent the complaint as alleging instead that CET overpaid the individual defendants for not working hard enough while on site. The majority follows this same approach, pretending that CET is merely disputing whether defendants billed hours that were or were not "expressly authorized by CET and charged in accordance with the CBA." Majority at 20.

Having recharacterized CET's complaint in this way, the defendants then argue that interpretation of the CBA is necessary to address their defense that the CBA's pay guarantees, minimum staffing levels, longstanding industry practices, and the parties' bargaining discussions justify the employees' wage claims, because employees are entitled to compensation for certain time not worked. The majority again echoes this approach, identifying hypothetical defenses that the defendants could raise to "excuse the workers from being present at the time of work reported on the timesheets" or to "explain why workers are compensated for time not actually worked." Majority at 20. Indeed, the majority goes

so far as to suggest there could be an interpretive dispute over whether defendants were entitled to compensation for paid holidays.[7]  Majority at 21.  The majority concludes that the mere existence of these hypothetical defenses in the CBA means that adjudication of CET's re-imagined claims will substantially depend on interpretation of the CBA.  Majority at 20–22.

These arguments are meritless.  We must consider CET's claims "as pleaded," and those claims allege only that defendants engaged in fraud by claiming they were present at Terminal 5 when they were not.  No contract terms in the CBA authorize that sort of fraud, so interpretation of the CBA is not required.  The defendants' possible future defenses do not turn CET's claims into "grievances" as defined in the CBA.  The Supreme Court has made clear that a party cannot manufacture a CBA dispute through raising a defense.  *See Caterpillar, Inc v. Williams*, 482 U.S. 386, 398–99 (1987); *Schurke*, 898 F.3d at 921.  While defendants may defend themselves on the ground that CET's allegations are factually erroneous (for instance, because workers arrived at the terminal but then were released from work as permitted under the CBA, because weather prevented work, because workers get a paid holiday for Christmas Day, or because CET could not provide sufficient work), such factual questions or excuses do not create any disputes about the interpretation of CBA provisions at this stage of the litigation.  Nor does the defendants' defense that the alleged fraud did not result in overbilling raise an interpretive dispute.  As our en banc court has explained, a defendant's allegation of "a hypothetical

---

[7] Given that the CBA helpfully defines Christmas Day as December 25, there is unlikely to be an interpretive dispute over the defendants' entitlement to payment for this holiday.

connection between the claim and the terms of the CBA is not enough" to conclude that the claim "cannot be resolved without interpreting the applicable CBA." *Cramer*, 255 F.3d at 691.

The majority's further arguments that CET's claims are grievances under the CBA are meritless. First, the majority places weight on CET's alleged failure to argue "that its claims are unrelated to the CBA." Majority at 21. It then argues that CET's claims *are* related to the CBA because "the subject of its claim, the number of hours for which its employees are entitled to claim payment, is at the core of an employment relationship." Majority at 21. Factually, of course, the majority is wrong: CET argued on appeal that "the district court erred in finding that CET's RICO claim required substantial analysis of the CBA," because "CET's complaint makes no reference to the CBA," "does not rely on" the CBA, and the complaint "alleges simply that the ILWU and Members submitted fraudulent timecards claiming they worked time that they did not work." But more important, for purposes of determining whether CET's claims are "grievances" subject to resolution under the CBA, the existence of an employment relationship between CET and the defendants is not dispositive. As the Supreme Court has explained, "not every dispute concerning employment, or tangentially involving a provision of a collective-bargaining agreement, is pre-empted by § 301 or other provisions of the federal labor law." *Caterpillar*, 482 U.S. at 396 n.10 (quoting *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 211 (1985)). CET must only argue (as it did persuasively) that resolving its RICO claims does not require resolving any active interpretive dispute as to the particular meaning of CBA provisions. Our task, in turn, is merely to consider whether CET's claims are "grievances" for purposes of the CBA.

Second, the majority argues that CET's claims are "grievances" covered by the CBA because the CBA provisions "could excuse" workers from being present or "could explain" compensation for time not worked. Majority at 20. But the CBA does not define a "grievance" as including possible defenses that may be raised by a defendant. The majority's ruling is contrary to federal common labor law, which holds that unless there is a currently existing, active dispute requiring interpretation of the CBA, such a claim does not require interpretation of the CBA. *See Cramer*, 255 F.3d at 691–92. Rather, "we have held that a CBA provision does not trigger preemption when it is only *potentially* relevant to the state law claims, without any guarantee that interpretation or direct reliance on the CBA terms will occur." *Humble v. Boeing Co.*, 305 F.3d 1004, 1010 (9th Cir. 2002); *see also Dent v. Nat'l Football League*, 902 F.3d 1109, 1116–17 (9th Cir. 2018) (same). If CET broadens its theory of liability later in litigation, the defendants may again raise an argument under § 301 of LMRA, and the court can then decide whether to refer interpretive disputes to the CBA's arbitration procedures at that time. *See McCray*, 902 F.3d at 1013 & n.3. Likewise, if disputes arise in the calculation of damages, then relevant interpretive disputes may be referred to the CBA's arbitration procedures. *See, e.g.*, *Lingle*, 486 U.S. at 413 n.12; *Schurke*, 898 F.3d at 922 & n.14. But because no active interpretive dispute exists at this time as CET's claims are pleaded, these claims are not subject to resolution under the CBA.[8] Nor

---

[8] Therefore, the majority has it backward in saying that CET must first "exhaust the grievance process" and then return to federal court with its claims. Majority at 27. Moreover, the majority's promise that CET can return to federal court after arbitration is an empty one. This promise would make sense if the majority held it was necessary for arbitration to

would analogous state law claims be removable under § 301 of LMRA if CET had raised the claims in state court.

Because CET's RICO claims are not a "dispute . . . as to the interpretation, application, or violation of any provision of" the CBA, there is no "grievance," as defined in the CBA. The arbitration agreement is not "ambiguous about whether it covers the dispute at hand," *Granite Rock*, 561 U.S. at 310, because the CBA is not susceptible to an interpretation that CET's RICO claims require an interpretation of the CBA. There is no ambiguity that would give rise to a presumption of arbitrability. Because "a court may submit to arbitration only those disputes that the parties have agreed to submit," *id.* at 302 (cleaned up), the majority errs in holding that CET's claims are subject to the CBA's grievance and arbitration procedure.

E

The majority opinion is both erroneous and internally inconsistent. First, it presents an erroneous theory of LMRA preclusion. Under the majority's new rule, almost any employment-related dispute between parties covered by a CBA is precluded and sent to arbitration, even though the Supreme Court has expressly disclaimed this approach and, unlike the RLA, LMRA itself does not require arbitration of

---

resolve a key issue in CET's RICO claims, and then CET could litigate the remainder. *Cf. Schurke*, 898 F.3d at 922 & n.14. But because the majority does not and cannot do so—because there is no such key issue—its promise is empty.

every precluded claim. *See Schurke*, 898 F.3d at 918 n.7.[9] Second, even though the majority goes on to hold that it remains necessary to determine whether CET's claims are covered by the arbitration provision, the majority fails to apply the *Granite Rock* framework correctly, and instead holds that the CBA applies based on meritless, hypothetical connections to CBA provisions. *Cf. Schurke*, 898 F.3d at 921; *Cramer*, 255 F.3d at 691–92. This approach is directly contrary to the Supreme Court's labor arbitration precedents, which prevent a court from compelling arbitration of disputes that the parties have not agreed to arbitrate.

The majority offers the reassurance that workers, at least, will not be compelled to arbitrate all their disputes, because our cases allow workers to litigate claims based on statutes that provide "substantive guarantees for workers." Majority at 27–28. Under this rationale, only employers will have to arbitrate their claims without their consent. But the Supreme Court's labor arbitration precedent does not permit this lopsided interpretation of LMRA. If the CBA expressly requires the arbitration of a federal statutory claim, the worker is bound to arbitration, regardless of any "substantive guarantee." *See Penn Plaza*, 556 U.S. at 256 n.5, 263–64. And by the same token, if the employer did not consent to arbitrate a federal statutory claim, then no labor policy considerations can require the employer to do so. *See Granite Rock*, 561 U.S. at 299, 303.

---

[9] The majority disputes this characterization, Majority at 26–27, but the majority points to no basis for its conclusion that CET's RICO claims are "substantially dependent on interpretation of the CBA" (Majority at 20) other than its reasoning that the defendants who allegedly defrauded CET were parties to a CBA and can now manufacture CBA-based defenses to compel arbitration.

Taken together, the majority's many misstatements of law upend the carefully limited scope of § 301 of LMRA that our circuit has so consistently upheld and give future defendants new, previously rejected, ways of depriving CBA-covered plaintiffs of their rights to a judicial forum and to vindication of independent statutory rights. I therefore dissent.

BENNETT, Circuit Judge, joined by IKUTA, R. NELSON, BUMATAY, and VANDYKE, Circuit Judges, dissenting from the denial of rehearing en banc:

Our Labor Management Relations Act ("LMRA") § 301 preemption doctrine developed to prevent state courts from interpreting collective bargaining agreements ("CBAs") inconsistently under state law. *Teamsters v. Lucas Flour Co.*, 369 U.S. 95, 104 (1962) ("[I]n enacting [§] 301 [of the LMRA,] Congress intended doctrines of federal labor law uniformly to prevail over *inconsistent local rules*." (emphasis added)). We have never applied that reasoning to preempt (or "preclude") a federal statutory claim. But in *Alaska Airlines Inc. v. Schurke*, we erroneously suggested in a footnote that § 301 "precludes" federal statutory claims in the same way it preempts state law claims. 898 F.3d 904, 920 n.10 (9th Cir. 2018) (en banc) ("The same principle [of LMRA preemption] applies to federal law claims, although they might better be described as 'precluded.'"). Led astray by this footnote, the panel entrenches the position that § 301 can preclude federal statutory claims.

But the footnote was wrong, and the panel is wrong. "Whether called 'preemption' or 'preclusion,'" Op. 18, the LMRA does not bar a federal statutory claim brought in

federal court. Today, the barred claim is a Racketeer Influenced and Corrupt Organizations Act ("RICO") claim alleging a $5.3 million mail and wire fraud racketeering scheme. Tomorrow, the barred claim may be based on the Americans with Disabilities Act ("ADA") or Title VII of the Civil Rights Act of 1964. We should have reheard this case en banc to excise this erroneous preclusion notion from our jurisprudence, and I respectfully dissent from our failure to do so.

I start with what ought to be a very straightforward premise—preclusion of federal claims is inconsistent with the purpose of § 301, which is primarily a jurisdictional statute intended to ensure the uniform interpretation of CBAs. And because preclusion of federal statutory claims is so divorced from the purpose of § 301, the panel's idea of preclusion creates absurd and confusing results, as this case shows. But the most fundamental problem is the most obvious. A statute passed by Congress to help maintain a uniform body of federal labor law does not somehow nullify a different statute passed by Congress to, among other objectives, eradicate organized attempts to defraud through a pattern of racketeering activity. *Cf. Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 49–50 (1974) ("In submitting his grievance to arbitration, an employee seeks to vindicate his contractual right under a collective-bargaining agreement. By contrast, in filing a lawsuit under Title VII, an employee asserts independent statutory rights accorded by Congress.").

Though this is the panel's most fundamental error, it is not the only one. The panel applies a presumption of arbitrability contrary to Supreme Court precedent and creates an agreement to arbitrate RICO claims, even though the

parties never signed such an agreement.[1]  By doing so, the panel invents a new rule.  Absent an explicit arbitration *exclusion* clause, every issue that *could* relate to a CBA must be arbitrated—even if the parties never specifically agreed to arbitrate that issue.  *Contra Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 297 (2010) ("[A] court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate *that dispute*.").  The panel also does not provide any coherent principle that limits its new rule.  If alleged fraud must be arbitrated as the panel claims, which other RICO predicate acts and federal statutory claims *must* be arbitrated?  We should have reheard this case en banc to correct all these errors.

## I.

The purpose of LMRA preemption of state law claims is to prevent divergent interpretations of a CBA.  "The interests in interpretive uniformity and predictability that require that labor-contract disputes be resolved by reference to federal law also require that the meaning given a contract phrase or term be subject to uniform federal interpretation."  *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 211 (1985).  And our test for § 301 preemption reflects that purpose: *state law claims* are preempted if they are "founded directly on rights created by collective-bargaining agreements" or are "substantially dependent on analysis of a [CBA]."  *Caterpillar Inc. v. Williams*, 482 U.S. 386, 394 (1987)

---

[1] Even if plaintiff Columbia Export Terminal, LLC ("CET") and the International Longshore and Warehouse Union ("ILWU") *had* contracted to arbitrate such a dispute, which they did not, CET's RICO claim would still not be *precluded*.

(quotation marks omitted); *see also, e.g.*, *McCray v. Marriott Hotel Servs., Inc.*, 902 F.3d 1005, 1010 (9th Cir. 2018).

When a plaintiff brings federal claims in federal court, the need for LMRA preemption disappears. The supposed preclusion inquiry is whether the application of a federal statute would be plainly inconsistent with or frustrate the purpose of another federal statute. *See United States v. Est. of Romani*, 523 U.S. 517, 533 (1998). But how can *any* federal claim (much less a RICO claim) brought in federal court cause interpretations or applications of a CBA that *conflict with § 301*? A federal claim brought in federal court will necessarily be consistent with § 301's jurisdictional rule. And even if adjudicating a federal claim requires interpretation of a CBA, the court would simply apply federal common law, thus eliminating the risk of divergent interpretations of the CBA. *See Textile Workers Union of Am. v. Lincoln Mills of Ala.*, 353 U.S. 448, 451, 456 (1957). As Judge Ikuta noted in her dissent, "§ 301 has little work to do" here. Dissent, 31.

The panel conflates LMRA and Railway Labor Act ("RLA") preemption[2] in an attempt to justify the untenable position that "[w]hether called 'preemption' or 'preclusion,' [this] approach applies whether the conflicting statute is a federal or state provision." Op. 18. The panel claims that "[i]n *Hubbard* [*v. United Airlines, Inc.*, 927 F.2d 1094, 1098 (9th Cir. 1991)] . . . we held that the RLA, which . . . preceded the enactment of RICO, preempted a fraud claim under RICO." Op. 18. The panel also claims that *Atchison,*

---

[2] "The RLA establishes a comprehensive scheme governing labor relations on railroads and airlines." *Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1007 (9th Cir. 1990) (per curiam).

*Topeka & Santa Fe Railway Co. v. Buell*, 480 U.S. 557 (1987), "reiterated the general rule in favor of compelling arbitration in labor disputes." Op. 27 (quoting 480 U.S. at 565–67).

But there is no basis to the panel's claim that preemption under the RLA and LMRA is the same, or its claim that this incorrect premise somehow allows the LMRA to preclude *federal* statutory claims. Although both "RLA and LMRA § 301 preemption are, in effect, a kind of 'forum' preemption," *Alaska Airlines*, 898 F.3d at 922, the two statutes are very different. In the RLA, Congress established a *mandatory* arbitral forum superintended by the National Railroad Adjustment Board for disputes relating to the formation, interpretation, or application of relevant CBAs. *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 252 (1994); *Union Pac. R.R. Co. v. Bhd. of Locomotive Eng'rs & Trainmen Gen. Comm. of Adjustment*, 558 U.S. 67, 74 (2009). Thus, some federal claims brought in federal court that involve the interpretation of such CBAs are in the wrong forum. *See Hubbard*, 927 F.2d at 1098.

In contrast, § 301 was enacted to ensure "specific performance of promises to arbitrate grievances under [CBAs]." *Lincoln Mills*, 353 U.S. at 451; *see id.* at 452 ("Once parties have made a collective bargaining contract, the enforcement of that contract should be left to the usual processes of the law and not to the National Labor Relations Board." (quoting H.R. Conf. Rep. No. 510, 80th Cong., 1st Sess., p.42)). That is, the LMRA itself does not prescribe the

arbitration mechanism that parties must use, but merely facilitates the enforcement of CBAs through federal courts.[3]

Unlike the RLA, the LMRA "does not mandate arbitration, nor does it prescribe the types of disputes to be submitted to arbitration under bargaining agreements." *Hawaiian Airlines*, 512 U.S. at 263 n.9. So even though we use the same test to determine preemption under the RLA and the LMRA, the results are different. When a claim is preempted under the RLA, the plaintiff's claim is sent to the RLA's mandatory arbitration process. *See Hawaiian Airlines*, 512 U.S. at 252–53. But when a state law claim is preempted under the LMRA, it "must either be treated as a § 301 claim" under the complete preemption doctrine "or dismissed as pre-empted by federal labor-contract law," thus extinguishing the state law claim. *Allis-Chalmers*, 471 U.S. at 220. If the claim is treated as a federal common law contract claim, we might dismiss it "for failure to make use of the grievance procedure *established in the collective-bargaining agreement*." *Id.* at 220–21 (emphasis added).[4] But there is no basis for *precluding* a federal statutory claim under the LMRA or RLA. Indeed, contrary to the panel's

---

[3] Of course, a federal court may be unable to decide a federal claim if the parties have agreed to arbitrate it. But an agreement to arbitrate a claim does not mean the claim is preempted or precluded. A party, for example, cannot bring any claim that the party has released or that is barred by issue or claim preclusion. *See, e.g.*, *Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.*, 140 S. Ct. 1589, 1594 (2020). But that doesn't mean the claim is "precluded," as the panel uses the term.

[4] "As a general rule in cases to which federal law applies, federal labor policy requires that individual employees wishing to assert contract grievances must attempt use of the contract grievance procedure *agreed upon* by employer and union as the mode of redress." *Republic Steel Corp. v. Maddox*, 379 U.S. 650, 652 (1965) (emphasis added).

position, *Buell* held that "[t]he fact that an injury otherwise compensable under the [Federal Employers' Liability Act ("FELA")] was caused by conduct that may have been subject to arbitration under the RLA does not deprive an employee of his opportunity to bring an FELA action." 480 U.S. at 564.

Because the panel's erroneous extension of LMRA preemption to federal law claims contravenes longstanding Supreme Court caselaw, the panel opinion creates a circuit split. The Sixth Circuit has correctly recognized that, when a claim is "based on a federal cause of action and is in federal court, there is no danger of divergent application of a CBA's provisions by state courts; thus, the motivating purpose of § 301 preemption simply does not apply." *Watts v. United Parcel Serv., Inc.*, 701 F.3d 188, 192 (6th Cir. 2012). The Sixth Circuit declined to extend § 301's preemption analysis to plaintiff's ADA claim and instead concluded that "§ 301 of the LMRA does not preempt a claim brought in federal court under the ADA." *Id.* at 193. It is unclear how the panel believes that "[its] holding here is entirely consonant with *Watts*," Op. 17 n.2, while also acknowledging *Watts*'s holding that "the motivating purpose of § 301 preemption simply does not apply" when a federal statutory claim is brought in federal court, Op. 16.

The panel claims that "at least two circuits have held that the LMRA precludes FLSA [Fair Labor Standards Act] claims," Op. at 18 n.3, citing *Martin v. Lake County Sewer Co., Inc.*, 269 F.3d 673 (6th Cir. 2001), and the case it relied on, *Vadino v. A. Valey Engineers*, 903 F.2d 253 (3d Cir. 1990). But those cases applied the National Labor Relations Act's ("NLRA") six-month statute of limitations to a particular class of claims brought under the LMRA and

FLSA. Although applying the NLRA's statute of limitations may lead to the dismissal of a late-filed FLSA claim, that result is assuredly not § 301 preclusion.

The panel opinion claims that § 301 both preempts state law claims *and sub silentio* precludes federal law claims. In an attempt to justify this position, the panel conflates LMRA and RLA preemption. Because there is no basis for conflating preemption under the LMRA and RLA, or for extending that preemption to preclude federal law claims, the panel opinion needlessly creates a circuit split.

## II.

The panel creates a presumption of arbitrability contrary to Supreme Court precedent and, in doing so, rewrites the CBA to require arbitration of RICO claims—despite conceding that "[r]esolution of the RICO claims will . . . require interpretation of the CBA to determine how it applies, if it does, to *an issue which its express terms do not appear to discuss*." Op. 21 (emphasis added). But *Granite Rock* held that the presumption applies "only where a validly formed and enforceable arbitration agreement *is ambiguous* about whether it covers the dispute at hand." 561 U.S. at 301 (emphasis added). As I discuss below, the CBA here is not ambiguous—its arbitration provision does not cover CET's RICO claims. Thus, the presumption does not apply.

The panel suggests that the presumption in favor of arbitration applies whenever the parties have agreed to arbitrate some matters under a CBA and dispute only whether the CBA covers the claims alleged. Op. 26. But *Granite Rock* specifically rejected such an argument. "Although [*United Steelworkers of America v. Warrior & Gulf*

*Navigation Co.*, 363 U.S. 574 (1960)] contains language that might in isolation be misconstrued as establishing a presumption that labor disputes are arbitrable whenever they are not expressly excluded from an arbitration clause . . . the opinion elsewhere emphasizes that even in LMRA cases, 'courts' must construe arbitration clauses because 'a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *Granite Rock*, 561 U.S. at 301 n.8.

Perhaps recognizing the difficulty of applying the presumption to the CBA at issue, the panel attempts to rewrite it. Under the CBA here, "grievances" must be arbitrated. The CBA defines a grievance as any dispute about the "interpretation, application, or violation" of the CBA and the panel claims that interpretation and application of the CBA are involved here. Op. 20–27. But CET's dispute with the defendants concerns the alleged submission of fraudulent timesheets, and proof of such fraud does not require any interpretation or application of the CBA. That is especially so because CET's complaint alleges that some employees did "not show[] up at all and yet those who did show up submit[ted] time sheets indicating that the absent employee worked a full shift."

The panel points to various provisions of the CBA that require an employee who is sent home early to be paid for a half or full shift, as well as provisions that require paid meal periods, paid holidays, and paid vacation time. Op. 20–22. These hypothetical defenses may explain why employees may receive pay for time they do not work, but these hypothetical defenses do not authorize an employee to submit a timesheet on behalf of an absent employee. Nor do the provisions of the CBA explain why an employee might

submit a timesheet claiming hours that were not actually worked—especially if that employee did not show up to work.

The panel states that an issue may be "whether employees can claim all of their compensable hours in their weekly timesheets, or whether they must simply list time actually worked." Op. 21. But, in the panel's own words, the CBA's "express terms do not appear to discuss" this issue, *id*., thus admitting that CET's RICO claims likely depend on an issue that the CBA does not discuss. This is not merely a dispute over the hours that an employee worked and logged on a timesheet, but an allegation of a $5.3 million fraudulent scheme executed by approximately 150 employees over four years. As Judge Ikuta's dissent states, "[p]roving the elements of mail and wire fraud here requires only a factual inquiry into whether employees claimed they were working when they were not physically on site." Dissent, 40. That inquiry does not require interpretation of the CBA. The panel errs both in applying a presumption in favor of arbitration and in finding that the CBA requires arbitration of CET's RICO claims.

### III.

The panel's creation of a presumption in favor of arbitration and an agreement to arbitrate where none exists is not only legally erroneous, but also practically harmful. First, as plaintiff points out, the panel opinion "creates a new standard under which statutory claims are subject to arbitration unless a CBA expressly *excludes* statutory claims from the CBA's arbitration procedures." PFREB 3. The notion that any claim that is not expressly excluded is arbitrable largely defeats the point of negotiating a CBA; the

scope of arbitration would become comprehensive no matter what the CBA says, unless it explicitly excludes from arbitration a laundry list of claims. And typical CBAs (those without a laundry list of exclusions) will prove no less troublesome in litigation, forcing courts to deduce parties' arbitration intent from what they didn't say, rather than read the written agreement to determine what they specifically agreed to arbitrate. The panel's opinion will lead to a mass of arbitrations never contemplated by a CBA.

Second, there would be no objectively discernible rule to decide which federal statutory claims must be sent to arbitration and which can proceed in court. The panel argues that CET tried to circumvent arbitration by presenting "claims which are, in substance, labor disputes" as federal statutory claims. Op. 17. But the panel fails to explain how "Individual Defendants not showing up at all and yet those who did show up submitting time sheets indicating that the absent employee worked a full shift," is a contractual claim that was "artful[ly] plead[ed]" as a RICO claim. Op. 17. CET's claim describes precisely the kind of activity that RICO prohibits: "It shall be unlawful for any person employed by . . . any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate . . . in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). If fraud of this nature must be sent to arbitration in the panel's view, a CBA's arbitrability scope would be almost limitless, as almost any claim would relate to the

CBA.  If there is any limiting principle as to which claim must be arbitrated, I don't discern it.[5]

### IV.

Section 301 of the LMRA is a far-reaching provision that affects *every* CBA in "an industry affecting commerce." 29 U.S.C. § 185(a).  Until now, we have consistently applied § 301 preemption to further the statute's purpose of promoting uniform interpretations of CBA provisions. Today, the panel wrongly strips federal courts of jurisdiction to hear federal claims under the guise of "preclusion."  The panel's error is magnified by the lack of a limiting principle that explains which claims must be arbitrated and which can proceed to litigation, and by the panel's misconception of how to determine when a CBA mandates arbitration.  The actual standard requires a court to submit to arbitration only disputes that the parties have specifically agreed to submit. *See Granite Rock*, 561 U.S. at 302.  Because of the panel opinion, the standard in our Circuit will require us to submit to arbitration any claims that were not expressly excluded, even if there was no agreement to arbitrate such claims.  This erroneous change will harm both labor and management.

For all these reasons, I respectfully dissent from our decision not to rehear this case en banc.

---

[5] This case involved alleged mail and wire fraud.  But crimes such as arson, bribery, extortion, theft, embezzlement, obstruction of justice, and witness tampering can also be predicate acts under 18 U.S.C. § 1961(1). It takes little imagination to foresee how each of these predicate criminal acts by management or labor could be *related* to a CBA.  It also takes little imagination to see how a vast number of other federal statutory claims brought by labor or management could also be *related* to a CBA.